STATE of Maine

v.

**Lisa MORELLI.**

Supreme Judicial Court of Maine.

Argued May 8, 1985.

Decided May 31, 1985.

R. Christopher Almy, Dist. Atty., Michael Roberts (orally), Asst. Dist. Atty., Bangor, for plaintiff.

James S. Horton (orally), Bangor, for defendant.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN and SCOLNIK, JJ.

Charles K. Leadbetter, Wayne S. Moss (orally), Herbert Bunker, Asst. Attys. Gen., Augusta, for plaintiff.

Kettle, Carter, Hannigan & Klein, Dennis Levandoski (orally), Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and SCOLNIK, JJ.

WATHEN, Justice.

Defendant Lisa Morelli appeals from a judgment of the Superior Court (Oxford County), entered on a jury verdict, finding her guilty of manslaughter. . On appeal defendant raises two main arguments: 1) there was insufficient evidence to support the jury's verdict on the issue of causation, and 2) the jury instructions concerning intoxication were incomplete. We find no error and deny the appeal.

I.

On September 21, 1983, Truman Dongo, a reputed drug dealer, was shot and killed in Stow where he had been taken by Michael Marshall, Michael's brother Robert Marshall, and defendant. Dr. Ronald Roy, deputy chief medical examiner, testified that Mr. Dongo was struck by three or four bullets. One wound, made by a .22 caliber bullet, was in the lower right abdomen. In addition, there were several broken ribs on the left side and a severely fractured shoulder blade. Vertebrae in Mr. Dongo's neck were fractured, as was a bone in his upper right arm. Mr. Dongo's skull was also fractured. Dr. Roy testified that the level of fracture found in the upper body wounds indicated that a different weapon, capable of higher velocity, caused the upper body wounds as compared to the .22 caliber wound in the lower abdomen. Dr. Roy concluded that the cause of death was gunshot wounds of the head and trunk. He specifically included the wound in the "right pelvic area near the groin" among the wounds to the trunk.

Michael Marshall testified for the State at defendant's trial. He admitted that he had dealings with Mr. Dongo in the cocaine distribution business. Michael Marshall also testified that he owed Mr. Dongo approximately $8,500, and that Mr. Dongo had begun to pressure him to pay the debt. At trial, Michael Marshall stated that about one and one-half weeks before the shooting, he went to Mr. Dongo's apartment and was kept there against his will with his hands and feet bound. Shortly after this incident, according to Michael Marshall, he developed a plan to take Mr. Dongo's money and drugs.

On September 20, Michael Marshall, Robert Marshall, and defendant were at Mr. Dongo's apartment. Because, in his words, "the situation looked right", Michael Marshall threatened Mr. Dongo with a gun and then tied Mr. Dongo's hands and feet. At about 4:00–4:30 a.m. on September 21 after locating and taking Mr. Dongo's drugs and

money, Michael Marshall, Robert Marshall, defendant, and Mr. Dongo left Mr. Dongo's apartment by car, eventually arriving in Stow after making several stops for soda, beer, and motor oil.

After leaving the highway and driving onto a logging road, Michael Marshall parked the car. At trial, he agreed that he had a gun in his hand and control over Mr. Dongo. Michael Marshall testified that after a short walk with Mr. Dongo and defendant, he decided that he would "just tie Truman up, leave, take his money and drugs, and leave the state." According to Michael Marshall, he told defendant to go back to the car to get a telephone cord that had been used to tie up Mr. Dongo. Michael Marshall testified that defendant refused to get the cord, saying "You can't leave him here," and then she raised a gun and shot Mr. Dongo. According to Michael Marshall, Mr. Dongo, after being shot by defendant, began to move toward defendant, lunging for the gun that defendant had discarded after the shooting. Michael Marshall testified that he then shot Mr. Dongo once.

Defendant also gave testimony at her trial. She testified that on September 20 at Mr. Dongo's apartment she was "high" after drinking alcohol and snorting lines of cocaine, and that she felt sick and scared when Michael Marshall pointed a gun at Mr. Dongo in the apartment. She also testified that while at the apartment, Michael Marshall asked her to go to the kitchen to get a knife, the implication being that Mr. Dongo's throat would be cut. She stated that she refused to get the knife, and that Michael Marshall then gave her some valium tablets, telling her to take them, she would feel better. According to defendant, Michael Marshall gave her four more valium tablets (which she took) on the drive to Stow. She also drank about four beers on the drive to Stow.

In defendant's version of the events of September 21, after the car was parked on a woods road in Stow, Robert Marshall gave her a small hand gun. Defendant testified that Michael Marshall asked her, about four times, "Are you going to do it?," which defendant took to mean, "Are you going to shoot the gun?" Defendant stated that she thought Michael Marshall was going to kill Mr. Dongo. She testified that she buried her head in Michael Marshall's chest and "shot the gun in the general direction. I didn't know what I was shooting at." Defendant testified that Mr. Dongo was about three or four feet away from her when she fired. According to defendant, after she fired, she heard Mr. Dongo call her name, "Lisa", and saw him running toward her. Defendant testified that she threw down her gun, which fired on impact, and ran toward the car. She stated that while on the way to the car, she heard three more shots.

Mr. Dongo's body was not found until October 15, 1983. Defendant was arrested on October 18, 1983. Michael Marshall, Robert Marshall, and defendant were charged by the Grand Jury with intentionally or knowingly causing the death of Truman Dongo, in violation of 17–A M.R. S.A. § 201(1)(A) (1983). On the State's motion, defendant's trial was severed from that of her co-defendants.

Defendant testified for the State at the Marshalls' trial. Both of the Marshalls were convicted of murdering Mr. Dongo. Defendant's trial took place after that of the Marshalls. She was found guilty of the lesser included offense of manslaughter. It is from this conviction that she now appeals.

## II.

Defendant was indicted for the crime of murder and she was convicted of the crime of manslaughter. Throughout the trial, defendant preserved her contention that the .22 gunshot attributed to her, the .22 caliber bullet wound in the pelvis, "was clearly insufficient to cause death." Relying on the claimed failure to prove concurrent causation, defendant objected to the court's instruction on the lesser included

offense of manslaughter.[1] She now argues on appeal that the resulting conviction for manslaughter is unsupported by evidence that her conduct operated concurrently with the conduct of Robert and Michael Marshall in causing the death of Truman Dongo.

The crime of manslaughter is defined in 17–A M.R.S.A. § 203(1)(A) (1983) as follows:

1. A person is guilty of manslaughter if he:

A. Recklessly, or with criminal negligence, causes the death of another human being;

The formula for concurrent causation is contained in the definition of "causing a result" set forth in 17–A M.R.S.A. § 33:

Unless otherwise provided, when causing a result is an element of a crime, causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient.

Adjusting the definition to accommodate the State's burden of proof, defendant contends that the State failed to prove by sufficient evidence that her conduct was *not* clearly insufficient to cause death. This Court will sustain a challenge to a conviction on the basis of insufficiency of the evidence only if after viewing the evidence in the light most favorable to the State no finder of fact could rationally have found the essential elements of the crime beyond a reasonable doubt. *See State v. Snow*, 464 A.2d 958, 961 (Me.1983); *State v. McKenney*, 459 A.2d 1093, 1096 (Me. 1983).

Dr. Roy, a forensic pathologist and deputy chief medical examiner for the State of Maine, testified to the following observations of the victim's pelvic area on exam-ining the victim's clothing and body. The victim's pants had a hole in the front, near the fly, and his underwear had a matching hole. Upon x-ray examination of the corpse, a relatively intact .22 caliber bullet was found in the lower part of the right abdominal cavity. The right wing of the pelvic bone had been perforated by the gun shot. Because of the body's advanced state of decomposition, Dr. Roy was unable to determine whether the bullet might have damaged the urinary bladder, genital organs, rectum or prostate gland. Dr. Roy further testified that the pelvic wound, included by him as a cause of death, would not necessarily be fatal immediately. He stated, however, it would cause death eventually if untreated. On cross-examination, defendant's counsel asked the witness to assume that the pelvic wound was the only wound. He then asked hypothetically whether it was possible that the victim could have made his way to the public road, a distance of 563 feet, to seek help. The witness responded that it was possible but that it would depend on unknown factors, such as blood loss and shock. From this scenario defendant reasons that it is probable, though not certain, that the wound caused by her shot was clearly insufficient to cause Truman Dongo's death.

■ Because there was evidence that the other gunshot wounds, particularly the wound in the head, were capable of causing death in a far shorter period of time, they were clearly sufficient as a concurrent cause. The evidence also provides a rational basis for the jury to conclude that the wound in the lower abdomen as a concurrent cause, was not clearly insufficient to cause death. The medical witness testified that the wound would cause death. His testimony, if believed, supports the jury's conclusion that the wound was not clearly insufficient to cause death. The evidence

---

1. Defendant also objected to the instruction on liability as a principal for murder on the same claim of insufficient proof of causation. Be-cause the jury found only manslaughter, that claim is not presented on appeal.

supports the finding of concurrent causation.[2]

## III.

■ For the first time on appeal, defendant claims that the presiding Justice erred in instructing the jury on the use of evidence of intoxication as it might pertain to the charge of reckless manslaughter. In accord with 17–A M.R.S.A. § 37(2) the court instructed the jury that self-induced intoxication may not be used to negate the required mental state of recklessness. Such an instruction is consistent with our decision in *State v. Barrett*, 408 A.2d 1273, 1279 (Me.1979). Defendant made no objection to the court's instruction nor did she request any additional instruction. Defendant now argues, however, that the instruction was incomplete. Relying on 17–A M.R.S.A. § 37(3)(B), defendant suggests the court should also have instructed the jury that self-induced intoxication will negate the required mental state if the intoxicants are introduced "under such duress as

would afford a defense to a charge of crime." We review only for obvious error.

The short answer to defendant's claim of error is that there is *no* evidence in the record that defendant's use of intoxicants was the result of duress. Defendant points to evidence that while at Dongo's apartment, she became upset and began to shake. She testified that Michael Marshall gave her four valium tablets and said "take these." Such evidence does not rationally support the conclusion that she was acting under such duress as would afford a defense to a charge of crime. We find no obvious error.

The entry is: Judgment affirmed.

All concurring.

---

**2.** Defendant challenges the validity of certain statements made by the presiding Justice in explaining to counsel his rationale for submitting the manslaughter charge to the jury. Because the allegedly erroneous statements were not included in the charge to the jury, we have no occasion to comment upon them. In addition, we find no merit in defendant's claim that the verdict of the jury resulted from an impermissible compromise.